WILLIAM WRIGHT *versus* HENRY EASTMAN.

Where one co-partner furnishes another funds, which it was the duty of the other to furnish as a part of the capital stock, he may recover the same in an action of assumpsit, before the final settlement of the co-partnership business.

For a final balance, assumpsit may be maintained after the whole business of the co-partnership has been settled, and not before.

Where there was no money originally paid by either party to a co-partnership, but the capital stock consisted of accommodation paper, originally between the parties, but subsequently renewed and kept alive by the credit of another house, and it did not appear distinctly by whom it was ultimately paid, it is too remote from the original transaction, even if paid by the plaintiff, to authorize him to maintain assumpsit as for money advanced beyond his proportion of the co-partnership stock.

REPORTED by HATHAWAY, J., presiding at *Nisi Prius*.

This was an action for money had and received and money paid and goods furnished. The plea was the general issue, with an account in offset, and brief statement alleging partnership between the plaintiff and defendant.

To sustain his action the plaintiff introduced several drafts drawn by the defendant upon him, and paid by the plaintiff at maturity.

The plaintiff also introduced an agreement of Henry Eastman, dated December 20, 1851, as follows:

BOSTON, December 20, 1851.

In consideration of advances made by William Wright, by his acceptances and payment of numerous drafts, drawn by me on said Wright, to enable me to raise means to build the bark Fanny, and for other purposes, I agree, on settlement of accounts between him and me, to allow him, in addi-

tion to the sum of said drafts, regular interest, such further interest as shall be just and equitable as a compensation for the extra interest he shall pay for money on account of my delinquency in furnishing funds to meet said drafts and liabilities, as I originally intended to have done.

HENRY EASTMAN.

Witness: *Charles L. Wright.*

The defendant introduced a contract between the plaintiff and the defendant, dated May 4, 1850, to wit:

BOSTON, May 4, 1850.

Memorandum of agreement between William Wright, of Boston, and Henry Eastman, of St. Stephen, as follows:

Whereas the said Wright has, in a written contract made this day, with one Michever, of Eastport, to purchase of him a certain steamboat called the Samuel B. Wheeler:

Whereas, the said contract provides for the delivery of said boat to said Eastman, in manner therein set forth, and · for the payment thereof in said Eastman's drafts on said Wright, payable in four, eight and twelve months, and

Whereas, it is understood that said purchase is made on joint account of said Wright & Eastman, therefore, it is agreed by them, that each will furnish his equal proportion of the necessary means to meet the payment of said drafts, at maturity. And it is further understood, that said Eastman will proceed immediately to construct a vessel, of such dimensions and of such materials as he shall think best, for the purpose of taking and transporting said steamboat to California, there to be disposed of as may hereafter be decided upon, and all expenses and outlays for the construction of said vessel, and the transportation of said steamboat and other property to California, as above, shall be equally borne by said Wright & Eastman, and all the avails of the enterprise, whether from a sale of the property or otherwise, shall be equally divided between them.

[Signed]     WILLIAM WRIGHT,
             HENRY EASTMAN.

The plaintiff testified as follows: Eastman, the defendant, applied to me personally, in April, 1850, to go into this transaction. He bargained for the steamer S. B. Wheeler, and drew on me for it. I paid the drafts when due, as well as the other drafts that have been presented. I do not know what the drafts were used for.

He testified, that at first Eastman drew on Bates & Co., and afterwards he drew himself on Bates & Co., and took up Eastman's drafts. The £200 draft was given to pay for a renewal of the $10,000 acceptance of Bates & Co. I made an arrangement to guaranty the amount of the drafts on Bates & Co. Eastman mortgaged the bark Fanny to Bates & Co. to secure them. This was done with my consent. I desired to have her go into their hands as security for me and them, on Eastman's representations, which were false. He represented to me, and to Bates & Co., that she was worth $35,000. I had not then seen her. She was sold to me by Bates & Co., October 30, 1852. I made no request of sale. I paid $10,000 for her. Bates & Co. insisted on selling her at auction. By request of Bates & Co. and Eastman I bought her for $10,000, and gave Eastman an opportunity to take part if he wished. Bates & Co. had the management of the Fanny after she was put into their hands, and received her earnings after she returned from California.

At the time the agreement was made, in May, 1850, I did not agree to accept any drafts except those for the steamer S. B. Wheeler. Eastman said he had the ability to build the bark, and would do so, and that would about offset the steamer.

He also testified: "I paid the bills mentioned in the schedules;" and the plaintiff further stated that the various drafts mentioned in the schedules, in favor of the parties specified in said schedules, were drawn to pay these bills. He also stated that he paid the insurance specified in those schedules, together with the commissions charged by Bates & Co., who effected insurance at the request of Eastman.

The defendant then introduced a letter of plaintiff, of July 6, 1852, a receipt of plaintiff to defendant, of two drafts on Bates & Co. for $2000 and $2500, dated October 14, 1850; a receipt of plaintiff to defendant, of March 27, 1851, for three notes of $2000 each, on six, seven and eight months; a receipt of plaintiff, dated October 14, 1850, for $1200, and letter of plaintiff to defendant dated September 9, 1850.

Plaintiff then introduced three notes of defendant, specified in receipt of March 27, 1851, and stated that he received the notes for his accommodation; that he had used one of them, and taken it up at maturity as indorser, and the other two notes he had always held, and now offered the three notes to defendant in exchange for the receipt. It is the custom in Boston to charge two and a half per cent. on accommodation acceptances.

The defendant then introduced the accounts of Bates & Co., and the plaintiff testified that the item of credit in their account, of $8300, arose out of the sale of the Fanny; and stated that all the monies he had recived of Bates & Co. he had received on his own guaranty — could not have got it without his guaranty.

He also testified that Eastman had large dealings with Bates & Co. on his own account. A copy of the power of attorney of Eastman to Bates & Co., and also of the mortgage to them by Eastman, was introduced by the plaintiff. He also read in evidence the agreement of Bates & Co. to accept Eastman's draft, dated October 1, 1850, and the plaintiff's guaranty thereon. Also, Bates & Co.'s agreement to sell the Fanny, dated October 30, 1852.

The plaintiff testified, in reply to the defendant's question, that the draft in favor of Sewall Day & Co. was drawn for the rigging of the bark Fanny; that to Wright & Whitman was for duck; to Potter, Leland & Co., for beef and pork; to William Thomas & Co., for yellow metal; James Weld & Co., for ship's stores. The testimony put into the case by the defendant, of transactions subsequent to the date of the plaintiff's writ, was objected to, but admitted on the defend-

ant's stating that it was offered to show the unsettled state
of the accounts between the parties, and that the partnership
transactions continued long after this suit.

Agreement of October 1, 1850 :

Whereas, Bates & Co., of Boston, have granted unto
Henry Eastman, of St. Stephen, the letter of credit, a copy
of which is hereto annexed, *at my special instance and
request, and as well for my benefit and accommodation as for
the benefit and accommodation of said Eastman,*

Now, in consideration thereof, and ten dollars to me paid
by said Bates & Co., I do hereby promise, undertake and
agree, to and with said Bates & Co., that the said Henry
Eastman shall well and truly keep and perform all the stipu-
lations, conditions and agreements, specified and contained
in the said letter of credit, on his part to be observed, kept
and performed, and that I will guaranty to them the faithful
performance thereof, and will save harmless and indemnify
them for all loss, costs, payments and damages which they
may make, sustain or incur by reason of granting said letter
of credit, hereby waiving all notice of the acceptance of this
guaranty by them, and notice of the delivery or accepting
of the drafts therein named, and also notice of any default or
failure on the part of the said Henry Eastman.

For all the liabilities on account of, or in any way con-
nected with the bark now building by said Eastman, as also
on account of cargo by said bark, I hereby agree to save
harmless the said Bates & Co., and to indemnify them from
all loss which they may sustain, meaning to be answerable
for said Eastman no farther than what relates to said bark
and cargo, and drafts drawn as aforesaid, and reserving the
right to discontinue and annul this obligation at pleasure as
to all prospective engagements and liabilities on the part of
said Bates & Co.          [Signed]          WILLIAM WRIGHT.

*F. A. Pike,* counsel for the plaintiff.

In May, 1850, the defendant, a merchant residing in St.
Stephen, in the Province of New Brunswick, applied to the

Wright *v.* Eastman.

plaintiff, a merchant residing in Boston, to go into a venture with him, in sending a steamer to California. After repeated applications, the plaintiff consented, and on May 4th, 1850, entered into the agreement which is presented in this case. In pursuance of that agreement the defendant went on and built a vessel, and fitted her out, and put cargo into her, and in December of the same year she sailed for California, taking in her the steamer "S. B. Wheeler," and also carrying cargo and passengers. The defendant himself went out and took charge of the venture in California, sailing from Boston in January, 1851.

The amount received by the plaintiff as returns from the venture appear fully in the case, but what amount was received by the defendant does not appear, nor does it appear whether the speculation was upon the whole profitable or otherwise, nor is it material. The plaintiff in this case claims, that by the agreement of May 4th, 1850, he was to furnish one half of the original outlay, and that having furnished more than that to the defendant, and by his request, he is entitled to recover back the excess in this action.

Where one party contributes more than his proportion of the capital of the partnership, in order to launch the partnership, he may recover back the excess of his co-partner in an action of assumpsit. *Marshall* v. *Winslow*, 11 Maine R., 61.

Where a contract is preliminary to the partnership, and in contemplation of it, such as a promise to contribute so much to the partnership funds, in stock or money, an action can be maintained without settling up the partnership concerns. Story on Partnership, p. 320, in note; *Williams* v. *Henshaw*, 11 Pick. R., 84; *Paine* v. *Thatcher*, 25 Wendall R., 450.

Considering the law well settled in these and other decisions, I shall examine the facts of this case with reference to it. He paid:

| | |
|---|---|
| Sewall Day & Co., for cordage, | 2169,00 |
| Wright & Whitman, for duck, | 1095,27 |
| William Thomas, for yellow metal, | 2334,70 |
| | 5598,97 |

There is no reason in law or equity why the plaintiff should not recover the amount which he has furnished for the defendant, unless it is found in the Bates & Co. account. But the Bates & Co. account should not prevent this conclusion, because:

1. Wright actually paid the amounts.

2. It does not appear in the case that Wright received of Bates & Co. anything toward their payments.

3. Because the agreement between Bates & Co. and Wright, and Eastman, is an independent and separate agreement, and must stand on its own footing.

4. Because Wright has actually paid all the advances made by Bates & Co.

1. There is no dispute about this proposition. The evidence is full and uncontradicted.

2. "It does not appear that Wright received anything of Bates & Co. towards these payments."

That he received large sums of Bates & Co. is not denied, but he received no specific sum for a specific purpose. If he took the money he received of Bates & Co., and applied it to another purpose, as he might well enough do, and advanced other money to pay these bills, it would make no difference to Eastman.

Nor does it appear that at any time when he paid a single draft or a single bill, that he had any money in his hands that he had received from Bates & Co. If the defendant would avail himself of this point he should have shown when Wright received the money of Bates & Co, and that he had it in his hands when the amounts were disbursed.

3. The agreement with Bates & Co. is a distinct and independent contract, and must stand on its own footing.

It was an agreement to raise money. Wright raised it on his guaranty, and he says that without his guaranty it could not have been raised. How, then, could Eastman charge Wright with this money, when Wright's own liability was outstanding?

Should Wright pay Eastman this sum, and be liable ove

Wright *v.* Eastman.

again to Bates & Co.? Eastman had paid Wright no money, nor anybody else any money for Wright, and why, then, should he recover of him?

A simple liability to pay is no ground of action. The farthest the courts have gone is to sustain the consideration of a promissory note, given on account of liability as indorser where the maker was insolvent, and the liability had become fixed.

So far as Bates & Co.'s accounts are concerned, the parties would stand off, were there no further proof in the case than the fact that upon their joint liability, Bates & Co. furnished Wright with money. Each of them were finally liable to Bates & Co. Wright's position, after waiving notice, was the same as that of a joint promissor to Bates & Co.

But if it was otherwise, it would not benefit Eastman. Suppose Eastman lent Wright his notes, and Wright had procured the money on them without indorsing them. Eastman could not have sued Wright on account of them until they matured; until he paid something he could have no right of action.

4. Wright had actually paid all the advances made by Bates & Co. before the date of this writ.

The defendant has put in Bates & Co.'s account, and an examination of it shows that the original draft account stopped January 15, 1851. It had then run to $16,500, and $3,000 for insurance. Those drafts all matured before this action commenced, and were paid by this plaintiff.

The last of the series was for $10,000, and matured September 18, 1851. The insurance matured October 15, 1851. All this is shown by Bates & Co.'s account.

But the defendant says they were paid by other drafts; but what of that? He paid nothing on either, and he has no right to complain. But the whole *modus operandi* of payment is in the case, and without objection on the part of the defendant; and by the agreement the court are to take into consideration all such testimony.

It appears, then, the paper subsequently given by the defendant, was taken up, and the plaintiff's own paper substituted, and that paper has all been paid, and the whole account discharged. So that the money furnished by Bates & Co. to Wright, has all been paid to them by him. An examination of Bates & Co.'s account shows that Eastman has never paid the first dollar of it. There are two credits in it, one of $8382.42, for balance of Eastman's account, and another of $640.78; but these come from the partnership property.

Wright paid Bates & Co. 10,000 for the bark, and then the guaranty account got credit for $1617.58 less. This amount Eastman got the benefit of in his private account with Bates & Co., so that Eastman never paid anything toward the liquidation of this account. Besides, the Fanny ran at a loss after leaving California, and an examination of Bates & Co.'s account shows this further fact: that the amount paid by Bates & Co. for insurance and disbursements on the Fanny, for interest and commissions, exceed the amount they received for the earnings of the Fanny, and the proceeds of the sale of her by $2561.92.

The defendant's counsel may say that there was a loss on the enterprise, but it appears quite clearly that the defendant must have bettered his condition out of the transaction.

He was in California, and had the management of affairs there. The steamer was there, running, more than a year probably, for it does not seem that she was sold until late in 1852, and the plaintiff received but $3200 for her earnings.

There was a cargo of $6953,20 paid for by the plaintiff, for which he never received one cent, and there was $4600 of freight money of the Fanny out to San Francisco, of which the plaintiff received nothing.

All these sums the defendant received, and rendered no account, and gives no account here in this trial.

But the defendant sets up the defence of partnership, and of course it does not lay in his mouth to say that the partnership suffered loss.

The view I have taken is further confirmed by the defendant's agreement of December 20, 1851, to which I would call the especial attention of the court, as in it the defendant states the facts, that the plaintiff had furnished the means to build the Fanny, and for other purposes, and that he himself had not furnished the means he originally intended to have furnished, and agreeing, in consideration of that, to pay a reasonable compensation for extra interest paid on account of his delinquency.

This is an express acknowledgment of an intelligent merchant, and made after the transaction was all completed, so far as advances were concerned, and when he knew just how the thing stood.

The amount of advances made by the plaintiff is not specified, but there is no need of it, as the amounts are all fixed.

It shows clearly that the defendant, at that time, had no idea of charging the plaintiff with the amount received of Bates & Co., on their mutual guaranty.

I have argued the case upon the presumption, that the drafts drawn by the defendant, in the summer of 1850, upon the plaintiff, and paid by him to the amount of $7246,10, were drawn for the purpose of raising money to build and complete the Fanny. Whether they were so drawn or not, does not appear. Wright says he does not know.

The legal presumption would be against the position. Wright's testimony and his letters, and Eastman's, all negative the legal inference that Wright had money of Eastman's in his hands at the time of acceptance.

Eastman's agreement of December 20, 1851, specifies, drafts drawn for the purpose of building the Fanny, "and for other purposes."

Yielding then to the testimony in the case, the plaintiff proves that he was an accommodation accepter for Eastman, to the amount of $7426,10, and crediting Eastman with the $1000, furnished by C. H. Eastman, in his father's absence, and the $1200 paid by the defendant himself in October, 1850; it leaves the sum of $5226,10, for which the defendant

is liable, together with the commissions which Mr. Wright testifies are customary in Boston, and interest. This is undoubtedly the true view of the case. It changes the figures of advances to that extent, but makes no difference in the aggregate amounts, whether it is reckoned separately or as a portion of the advances, as I have already exhibited.

Should the court dissent from the view I have already taken of the transaction, I submit that this one is free from all question of partnership, and in exact accordance with the testimony.

*Downes & Cooper*, counsel for the defendant.

The defendant contends:

1. That the plaintiff and the defendant were co-partners, and the subject matters of the plaintiff's account and bill of particulars filed in this action, were relative to and embraced partnership transactions, and the accounts of said partnership have never been adjusted or settled between them, and if they were fairly and properly adjusted, the balance would be in favor of said defendant. Therefore the plaintiff's action cannot be sustained. *Chase* v. *Garvin*, 19 Maine R., 211, and cases there cited; *Wilby* v. *Phinney*, 15 Mass. R., 116; *Champion* v. *Bostwick*, 18 Wend. R., 83.

2. That many of the items in the plaintiff's account and bill of particulars accrued, and are dated, after the commencement of the action and after the date of the writ, and therefore cannot be recovered in this action.

3. That the drafts drawn, indorsed or negotiated by the plaintiff were for the partnership business, as were also any advances of money, (if any were made by him,) and therefore the charges of commissions and interest in the plaintiff's account are wrong, and cannot be maintained.

RICE, J. From the evidence in the case, it appears that the parties in May, 1850, entered into an arrangement to procure and send to California a steamboat and vessel, in which she was to be transported, with such cargo and freight as they might deem for their interest to transport for them-

selves or others. The steamboat was purchased by the defendant, and paid for in drafts, drawn by him, on the plaintiff, and by him accepted, payable in four, eight and twelve months. The vessel, called the Fanny, was built by the defendant, and drafts were drawn by him upon the plaintiff, from time to time, to raise funds for her construction. It seems to have been the understanding of the parties, that each was to contribute an equal portion of the funds necessary to pay those drafts, as they should mature, and also pay an equal portion of the expenses of the outfit, and share equally in the proceeds of the adventure. Neither advanced any cash originally, to put the enterprise on foot.

The papers in the case show that as the drafts which were thus drawn came to maturity, neither party was in condition to pay them. The plaintiff became exhausted on the payment of the first draft given for the steamer, being one of those for five thousand dollars, and the defendant seems to have been equally exhausted by investing no larger sum in the construction of the " Fanny."

As their paper was running to maturity it became a serious question how funds were to be raised to pay them as they should fall due, and thus keep the " ship afloat," and prevent a failure of the enterprise. To this end an arrangement appears to have been made by the defendant with Bates & Co., a mercantile firm in Boston, by which he was at liberty to draw on them in favor of the plaintiff, for funds. This arrangement was made, as the plaintiff declares, at his special instance and request, and as well for his benefit and accommodation as for the benefit and accommodation of the defendant. Under this arrangement longer accommodations in the way of credits were obtained from Bates & Co. In this way, the enterprise appears to have been kept afloat, and their payments of the accommodation paper put forward. In the final payments of these acceptances to Bates & Co., as well as in advances for the general enterprise, the plaintiff claims that he is largely in advance, having paid much more

than the defendant, and for this alleged excess he brings this action.

The defendant controverts this position, and alleges that the plaintiff has received from the proceeds of the adventure large sums, which much more than indemnify him for any advances he has made, and that as matter of fact, all the payments he has made, or the larger part of them, at least, have been made from the proceeds of the adventure in which they were jointly interested; that all the claims of the plaintiff upon him grew out of partnership transactions which have not been finally adjusted and settled, and therefore this action cannot be maintained.

An examination of the evidence in the case has satisfied us that the whole enterprise out of which the claims and counter-claims between the parties originated, was a partnership transaction.

It is undoubtedly true that where one co-partner furnishes another funds, which it was the duty of the other to furnish as a part of the capital stock, with which to set on foot or launch the co-partnership, such funds thus furnished may be recovered in an action of assumpsit, without waiting for a final adjustment of the business of the copartnership. *Marshall* v. *Winslow*, 11 Maine R., 58. So, too, assumpsit may be maintained by a co-partner for a final balance due him after the business of the partnership has been *finally settled*, but not before. *Williams* v. *Henshaw*, 11 Pick. R., 79.

It is not suggested that all the business of the partnership, in this case, has been settled. The action cannot be maintained, then, as for a final balance due the plaintiff.

The evidence shows that there was no money originally paid into the concern by either party. The capital stock consisted in accommodation paper, principally, if not wholly. This paper, which was originally between the parties, was subsequently renewed and kept alive by the credit of Bates & Co. From what funds Bates & Co. were ultimately paid, does not distinctly appear; the whole matter is very much

complicated. But however that may be, even if paid by the plaintiff, as he contends it ultimately was, it was too remote from the original transaction, and too much involved in the subsequent business of the co-partnership to authorize the plaintiff to maintain assumpsit as for money advanced beyond his proportion, for the defendant, to set the partnership on foot. No judgment that could be rendered in this case would settle the matters in controversy between the parties, but would rather tend to involve them in deeper complication and confusion. A process in equity would seem to be an appropriate remedy for the plaintiff.

*Plaintiff nonsuit.*